RECEIPT # _____
AMOUNT $ 250
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE 6-8-05

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

KEVIN WINDOM, a Wisconsin resident,
On behalf of himself, the general public, and
All others similarly situated,

        Plaintiff,

    v.

THE GILLETTE COMPANY, a Delaware
corporation

Civil Action No. _____

# 05 cv 1 1 2 0 7 RWZ

MAGISTRATE JUDGE _____

### CLASS ACTION COMPLAINT

Plaintiff, individually and on behalf of all others similarly situated and the general public,

alleges by and through its attorneys, upon information and belief, as follows:

### JURISDICTION AND VENUE

1.    The Court has original jurisdiction over this class action pursuant to 28 U.S.C. §

1332(d)(2).

2.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(a)(1) because

Gillette has its principal place of business in this judicial district. Venue is also proper pursuant

to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the

claim occurred in this judicial district.

3.    Plaintiff and each member of the putative Class have suffered aggregate damages

exceeding $5,000,000, exclusive of interest and costs.

### PARTIES

4.    Plaintiff Kevin Windom is an individual citizen and resident of the state of

Wisconsin. During the relevant time period, Plaintiff Windom purchased an M3Power razor

manufactured, advertised, promoted and sold by Gillette and suffered damages as a result.

5.    Gillette is a Delaware corporation with its principal executive offices located at

The Prudential Tower Building, Boston, Massachusetts, 02199. Duracell is a product division of

Gillette.

## **FACTUAL ALLEGATIONS**

6. Gillette sells male shaving systems under the brands M3Power, Mach3 Turbo, Mach 3, Sensor3, SensorExcel, Sensor, Atra, and Trac II.

7. The razor market is fiercely competitive, specifically in terms of new technology, price, performance, marketing, advertising and promotion. (*2004 Annual Report and 2005 Proxy Statement*, The Gillette Company, pg. 56). Gillette's main competitor in the razor system market is Schick Manufacturing, Inc. ("Schick"), with its Schick razor product line. The stakes are high in the re-usable shaver and blade market. Annual sales in this market are reportedly $853 million. (*Gillette Ups Ante on Whisker Removal*, USA Today, Jan. 15, 2004). The global market is worth approximately $6 billion.

8. There is tremendous pressure and economic incentive to persuade consumers through advertising to "trade up." Consumers must be convinced that each new product launched will provide distinct benefits, worthy of price premiums. Consumers are "increasingly looking for the latest, most innovative products to make their grooming easy," making such advertising highly effective. (*Id*.)

9. Gillette launched M3Power razors and blades in or about May 2004, with a immense marketing blitz underway. Gillette's advertising of M3Power razor consisted of television ads, print media, point-of-sale ads, product packaging, and online advertising.

10. Gillette calls its M3Power razor system "revolutionary" because, powered by a AAA battery inserted in the shaver handle, Gillette claims the M3Power razor can deliver "gentle pulses to the shaving cartridge that stimulate hair upward and away from the skin, making it dramatically easier to shave more thoroughly than ever before."

11. Gillette claimed on its website that the M3Power "[m]icro-pulses raise the hair up and away from skin so you can shave closer and more thoroughly in one easy power stroke." It also claimed through its website that the M3Power's "pulsing action stimulates hair upward and away from the skin, making it dramatically easier to shave more thoroughly in one easy power

2

stroke."

12.     On the retail packaging for M3Power razors, Gillette advertises to consumers that
"[g]entle micro-pulses stimulate hair up an away from skin. In just one power stroke, you can
get a closer and more thorough shave. So thorough, there is less need to reshave, which means
less irritation."

13.     In its television advertising, Gillette claims: "Turn it on and micropulses raise the
hair so the blades can shave closer." The advertisement also contains an animation that depicts
hairs growing at a substantial rate, by as much as four times the original length.

14.     Plaintiff alleges that each of the above advertisements and representations made
by Gillette are false, misleading and deceptive.

15.     On January 28, 2005, Schick sued Gillette in Connecticut federal district court
over Gillette's M3Power claims. On March 31, 2005, after receiving expert testimony, the
Honorable Janet C. Hall entered an order enjoining Gillette from any further marketing,
promotion or advertising of claims that the M3Power razor (or its micro-pulses or oscillations)
"change the angle of hair in relation to the skin" or "extend or lengthen hair by a magnitude or
with a frequency that is not literally or physiologically accurate." A copy of the March 31, 2005
Preliminary Injunction Order is attached as Exhibit A to this Complaint.

16.     Judge Hall's order was not the first court decision in which Gillette's M3Power
advertising claims were questioned or enjoined by a court. In December 2004, a German court
enjoined Gillette from making the claims at issue. In addition, on March 3, 2005, the Sydney
Morning Herald reported that Energizer had obtained restraining orders against Gillette,
upsetting a $10 million M3Power product launch campaign. (*War Over Gillette's Hair-Raising
Claims*, Sydney Morning Herald, Mar. 3, 2005.)

17.     Gillette has profited enormously from its advertising and sale of M3Power razors
systems. Gillette charges consumers a premium for its M3Power system. On average, Gillette
charges 67% over the competition for the M3Power shaver and 15% more for blades, plus the
price of the required AAA battery. On February 2, 2005, Gillette reported record annual and

3

fourth-quarter revenues, stating that "the solid gains reflected one of the strongest Company-wide new product efforts in Gillette's history, including the introduction of the M3Power and Venus Divine shaving systems." (*Gillette Reports Record Fourth-Quarter and Full-Year Results*, Business Wire, Feb. 2, 2005). Indeed, in its argument that Schick post a bond before Judge Hall, Gillette argued that \$49,579,000 represents one-year's worth of future M3Power sales.

18.    Plaintiff also alleges on information and belief that Gillette has obtained substantial increased profits from "product collaboration" sales, through Duracell, of AAA Duracell batteries, which are commonly displayed near M3Power razor systems.  Plaintiffs alleged that Gillette would not have obtained such increased profits of battery sales but-for its false and misleading advertising of M3Power razor systems.

## CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action as a class action pursuant on behalf of himself, the general public, and on behalf of all others similarly situated.  Plaintiff seeks to represent the following class:

> **All persons and in the United States who between May 1, 2004 and the present ("Class Period") purchased, other than for resale, a Gillette M3Power razor (the "Class").**

20.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. Specifically excluded from the proposed Class is Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

21.    **Numerosity**:  The members of the Class are so numerous that their individual joinder is impracticable.  Plaintiff is informed and believes, and on that basis alleges, that the

4

proposed class contains hundreds of thousands of members. The precise number of Class members is unknown to Plaintiff. The true number of Class members are likely to be known by Defendant, however, and thus, may be notified of the pendency of this action by first class and by published notice.

22.   **Existence and Predominance of Commons Questions of Law or Fact**:

Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include:

> (i)     Whether Defendant's advertising, marketing and promotion of M3Power razors systems is unfair and deceptive.
>
> (ii)    Whether members of the class are likely to be deceived by Defendant's practices;
>
> (iii)   Whether Defendant has been unjustly enriched through deception of other methods of unfair competition;
>
> (iv)    Whether the Class is entitled to restitution for the amounts paid to Defendant for sales of M3Power razors, and if so, the proper measure thereof;
>
> (v)     Whether the Class is entitled to disgorgement of the amounts of profits obtained by Defendant from sales of M3Power razors, and if so, the proper measure thereof;
>
> (vi)    Whether the Class is entitled to punitive damages as a result of Defendant's advertising, promotion and sale of M3Power razors;
>
> (vii)   Whether the Class is entitled to injunctive relief prohibiting the challenged practices discussed herein, and enjoining such practices until they are rectified;
>
> (viii)  Whether Plaintiff is entitled to its attorneys' fees and expenses.

23.    **Typicality**: Plaintiff's claims are typical of the claims of the Class since Plaintiff purchased an M3Power razor. Furthermore, Plaintiff and all members of the Class sustained monetary injury arising out of Defendant's wrongful conduct.

24.    **Adequacy of Representation**: Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class that he seeks to represent; he has retained counsel competent and highly experienced in complex class action litigation; and he intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

25.    **Superiority**: The class action is superior to other available means of the fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. On information and belief, Defendant continues to engage in the practices described in this complaint.

26.    Adequate notice can be given to Class members directly using information maintained in Defendant's records, or through notice by publication.

27.    Plaintiff is informed and believes that Defendant benefited from the sale of the M3Power razor systems at issue to Plaintiff and the Class. Plaintiff and the Class were injured and lost money as a result of Defendant's advertising, and Defendant's unfair and deceptive

6

business practices.

## CLAIM FOR RELIEF
### (Unjust Enrichment)

28.     Plaintiff hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

29.     Defendant has benefited and been enriched by the above-alleged conduct. Defendant has sold, and continues to sell M3Power razor systems through improper, unlawful and deceptive methods, reaping benefits and profits from persons and entities nationwide as a result of these sales.

30.     Defendant has knowledge of this benefit.

31.     Defendant has voluntarily accepted and retained this benefit.

32.     The circumstances, described herein, are such that it would be inequitable for Defendant to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the Class.

33.     Plaintiff and the Class are entitled to the amount of Defendant's ill-gotten gains, including interest, resulting from its unfair and deceptive and inequitable conduct in advertising, promoting and selling M3Power razors systems to Plaintiff and members of the Class.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff requests of this Court the following relief, on behalf of himself and all others similarly situated:

1.     For an order certifying that this action may be maintained as a class action under Federal Rule 23, appointing Plaintiff and its counsel to represent the Class and directing that reasonable notice of this action be given by Defendant to the Class;

2.     For restitution, disgorgement and damages, according to proof, including pre-judgment and post-judgment interest as allowed by law;

7

3.    That Defendant be permanently enjoined from performing or proposing to perform any of the aforementioned acts of unfair, unlawful and fraudulent business practices;

4.    That Plaintiff recover its costs of suit, including expert witness fees, and reasonable attorneys' fees; and

5.    That Plaintiff be entitled to such other and further relief as this Court may deem just and proper.

## JURY DEMAND

To the full extent available, Plaintiff demands a trial by jury.

Dated: June 8, 2005

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____

THOMAS M. SOBOL (BBO# 471770)
EDWARD NOTARGIACOMO (BBO # 567636)
One Main Street, 4th Floor
Cambridge, Massachusetts 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Kenneth A. Wexler
Edward A. Wallace
THE WEXLER FIRM LLP
One North LaSalle St., Suite 2000
Chicago, Illinois 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

C. Brooks Cutter
Mark J. Tamblyn
KERHAW, CUTTER & RATINOFF LLP
980 9th Street, 19th Floor
Sacramento, California 95814
Telephone: (916) 448-9800
Facsimile: (916) 669-4499

Charles A. McCallum
R. Brent Irby
McCALLUM, HOAGLUND, COOK & IRBY, LLP
2062 Columbiana Road
Vestavia Hills, Alabama 35216
Telephone: (205) 824-7767
Facsimile: (205) 824-7768

*Attorneys for Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SCHICK MANUFACTURING, INC., ET AL | : |
| Plaintiffs | : |
| | : CIVIL ACTION NO. |
| v. | : 3-05-cv-174 (JCH) |
| | : |
| THE GILLETTE COMPANY | : MAY 31, 2005 |
| Defendant | : |

## RULING RE: MOTION FOR PRELIMINARY INJUNCTION [DKT. NO. 7], MOTION FOR LEAVE TO AMEND [DKT. NO. 103], and VARIOUS MOTIONS IN LIMINE [DKT. NOS. 104, 105, and 111]

The plaintiff, Schick Manufacturing Company ("Schick"), seeks a preliminary injunction enjoining the defendant, The Gillette Company ("Gillette"), from making certain claims about its M3 Power razor system ("M3 Power"). Schick contends that Gillette has made various false claims in violation of section 43(a) of the Lanham Act, 15 U.S.C. §1125(a) and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, et seq.

As a preliminary matter, Schick has filed a Motion for Leave to File and Amended Complaint [Dkt. No. 103]. Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The Second Circuit has held that "'considerations of undue delay, bad faith, and prejudice to the opposing party [are] touchstones of a district court's discretionary authority to deny leave to amend.'" Krumme v. WestPoint Stevens Inc., 143 F.3d 71, 88 (2nd Cir. 1998) (quoting Barrows v. Forest Laboratories, 742 F.2d 54, 58 (2d Cir. 1984)). Having considered these factors, as well as the scope of Schick's proposed amendments, the court concludes that leave to amend is appropriate.

The court must also address three pending motions in limine. With regard to

Plaintiff's Exhibits Nos. 111, 112, 131, the objections of Gillette are overruled. PX 131

is received for the limited purpose offered, to establish the date the Dutch action was

filed. With regard to Schick's Motion in Limine to Exclude Untimely Expert Testimony

[Dkt. No. 104], the Motion is denied, except with regard to the alternative relief sought.

DX 124(d) and (e) are for identification only. They were received on that basis. The

Motion is denied to the extent it seeks to strike them as demonstrative evidence. The

Motion is also denied to the extent it seeks to strike Dr. Salinger's testimony. However,

the court grants Schick's alternative request to file a supplemental Affidavit of Dr.

Thornton, which the court has now reviewed. Finally, the Motion to exclude DX 133

and DX 134, Declarations of Dr. Grupen and Dr. Clarke, is denied. With regard to

Schick's Motion in Limine to Exclude Third Declaration of Dr. Philpott, it is denied.

The standard regarding the grant of a prohibitory preliminary injunction in the

Second Circuit is clear.[1] "To obtain a preliminary injunction the moving party must

show, first, irreparable injury, and, second, either (a) likelihood of success on the merits,

or (b) sufficiently serious questions going to the merits and a balance of hardships

decidedly tipped in the movant's favor." Green Party of N.Y. State v. N.Y. State Bd. of

Elections, 389 F.3d 411, 418 (2d Cir. 2004). If Schick proves that irreparable injury may

result, the court will then consider the merits of Schick's claim.

The Lanham Act creates a cause of action against any person who,

---

[1]Gillette suggests the relief sought is a mandatory injunction; this court does not agree.
Schick seeks to prohibit allegedly false advertising, not to mandate action by Gillette. See
Phillip v. Fairfield University, 118 F.3d 131 (2d Cir. 1997) (an injunction is mandatory where "its
terms would alter, rather than preserve, the status quo by commanding some positive act").

2

in connection with any goods or services, or any container for goods, uses
in commerce any word, term, name, symbol, or device, or any
combination thereof, or any false designation of origin, false or misleading
description of fact, or false or misleading representation of fact, which . . .
(B) in commercial advertising or promotion, misrepresents the nature,
characteristics, qualities, or geographic origin of his or her or another
person's goods, services, or commercial activities

by "any person who believe he or she is or is likely to be damaged by such act." 15

U.S.C. § 1125(a).

In order to succeed on its false advertising claim, Schick must prove five

elements of this claim. Omega Engineering, Inc. v. Eastman Kodak Co., 30 F.Supp.2d

226, 255 (D.Conn. 1998) (citing various treatises and cases). These are the following:

(1) The defendant has made a false or misleading statement of fact. The

statement must be (a) literally false as a factual matter or (b) likely to deceive or

confuse. S.C. Johnson & Son, Inc. v. Clorox Company, 241 F.3d 232, 238 (2d

Cir. 2001).

(2) The statement must result in actual deception or capacity for deception

"Where the advertising claim is shown to be literally false, the court may enjoin

the use of the claim without reference to the advertisement's impact on the

buying public." Id. (internal quotations omitted).

(3) The deception must be material. "[I]n addition to proving falsity, the plaintiff

must also show that the defendants misrepresented an inherent quality or

characteristic of the product." Id. (internal quotations omitted).

(4) Schick must demonstrate that it has been injured because of potential

decline in sales. Where parties are head-to-head competitors, the fact that the

defendant's advertising is misleading presumptively injures the plaintiff. Coca-

3

Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 317 (2d Cir. 1982)

(abrogated on other grounds by statute as noted in Johnson & Johnson v. GAC

Int'l, Inc., 862 F.2d 975, 979 (2d Cir.1988)).

(5) The advertised goods must travel in interstate commerce.

## FACTS

The court held a scheduling conference on the preliminary injunction motion on

March 2, 2005. The court allowed the parties to conduct limited discovery prior to

conducting a hearing on Schick's motion for a preliminary injunction. The hearing on

the motion was conducted over four days: April 12, 13, 22, and May 2, 2005. During

the hearing, Schick called five witnesses: Adel Mekhail, Schick's Director of Marketing;

Peter M. Clay, Gillette's Vice-President for Premium Systems; Dr. David J. Leffell,

Professor of Dermatology; Christopher Kohler, Schick Research Technician; and John

Thornton, statistical consultant. Gillette also called five witnesses during the hearing:

Dr. Kevin L. Powell, Gillette's Director of the Advanced Technology Centre; Dr. Michael

A. Salinger, Professor of Economics; Peter M. Clay, Gillette's Vice-President for

Premium Systems; Dr. Ian Saker, Gillette Group Leader at the Advanced Technology

Centre and Dr. Michael P. Philpott, Professor of Cutaneous Biology.

The men's systems razor and blade market is worth about $1.1 billion per year in

the United States. Gillette holds about 90% of the dollar share of that market, while

Schick holds about 10%. The parties are engaged in head-to-head competition and the

court credits testimony that growth in the razor systems market results not from volume

increases but "with the introduction of high price, new premium items." Hr'g Tr. 39:20-

21.

Schick launched its Quattro razor system in September of 2003 and expended

many millions of dollars in marketing the product. Although Schick had projected $100

million in annual sales for the Quattro, its actual sales fell short by approximately $20

million. From May 2004 to December 2004, Quattro's market share fell from 21% of

dollar sales to 13.9% of dollar sales.

Gillette launched the M3 Power in the United States on May 24, 2004. In

preparation for that launch, it began advertising that product on May 17, 2004. The M3

Power is sold throughout the United States. The M3 Power includes a number of

components including a handle, a cartridge, guard bar, a lubricating strip, three blades,

and a battery-powered feature which causes the razor to oscillate. The market share of

the M3 Power, launched in May 2004, was 42% of total dollar sales in December 2004.

Gillette's original advertising for the M3 Power centered on the claim that "micro-

pulses raise hair up and away from skin," thus allowing a consumer to achieve a closer

shave. This "hair-raising" or hair extension claim was advertised in various media,

including the internet, television, print media, point of sale materials, and product

packaging. For example, Gillette's website asserted that, in order to combat the

problem of "[f]acial hair grow[ing] in different directions," the M3 Power's "[m]icro-pulses

raise hair up and away from skin . . ." PX 2, Hr'g Tr. 33:25-34:22. Of Gillette's

expenditures on advertising, 85% is spent on television advertising. At the time of the

launch, the television advertising stated, "turn on the first micro-power shaving system

from Gillette and turn on the amazing new power-glide blades. Micro-pulses raise the

hair, so you shave closer in one power stroke." PX 14.2(C). The advertisement also

included a 1.8 second-long animated dramatization of hairs growing. In the animated

5

cartoon, the oscillation produced by the M3 Power is shown as green waves moving over hairs. In response, the hairs shown extended in length in the direction of growth and changed angle towards a more vertical position.

The court notes that eight months passed between the launch of the M3 Power and the date Schick initiated the instant suit. Schick maintains that there are two factors that excuse this delay. First, Schick invested time in developing a stroke machine and test protocol that would allow it to test the M3 Power with some degree of confidence and effectiveness.[2] Specifically, the development of a machine that would deliver a stroke of consistent pressure to a test subject's face took time. Second, after completing its first tests of Gillette's claims that the M3 Power raises hair in October, Schick chose to pursue its claims in Germany. In November of 2004, Schick sued Gillette in Germany to enjoin it from making claims that the M3 Power raised hairs. In late December of 2004, the Hamburg Regional Court affirmed the lower court's order enjoining Gillette from making such claims in Germany.

While the court finds that it may have been possible to develop testing protocols in a quicker fashion, the court finds the M3 Power was a new product with a feature (the use of battery power) that had never before been present in wet shavers. The court finds the time Schick took to develop testing of and to test the M3 Power is excusable. The court has been presented with no evidence of bad faith or strategic maneuvering behind the timing of the instant lawsuit.

In late January of 2005, Gillette revised its television commercials for the M3

―――――――――――――――

[2] The court also notes that time spent by Schick testing Gillette's "angle-change" claim, which claim Gillette abandoned in January of 2005.

6

Power in the United States. It chose to do so based on both the German litigation as well as conversations between the parties about Schick's discomfort with certain claims made in the advertising. The animated product demonstration in the television commercials was revised so that the hairs in the demonstration no longer changed angle, and some of the hairs are shown to remain static. The voice-over was changed to say, "Turn it on and micropulses raise the hair so the blades can shave closer." PX 14.10C. The product demonstration in the revised advertisements depicts the oscillations to lengthen many hairs significantly. The depiction in the revised advertisements of how much the hair lengthens--the magnitude of the extension--is not consistent with Gillette's own studies regarding the effect of micropulses on hair. The animated product demonstration depicts many hairs extending, in many instances, multiple times the original length. Gillette began broadcasting the revised television commercials on or about January 31, 2005. Schick provided credible evidence, however, that the prior version of the advertisement is still featured on the Internet and on product packaging.

Television advertisements aim to provide consumers a "reason to believe," that is, the reason consumers should buy the advertised product. Because of the expense of television advertising, companies have a very short period of time in which to create a "reason to believe" and are generally forced to pitch only the key qualities and characteristics of the product advertised.

Gillette conceded during the hearing that the M3 Power's oscillations do not cause hair to change angle on the face. Its original advertisements depicting such an angle change are both unsubstantiated and inaccurate. Gillette also concedes that the

7

animated portion of its television advertisement is not physiologically exact insofar as the hairs and skin do not appear as they would at such a level of magnification and the hair extension effect is "somewhat exaggerated." Gillette Co.'s Prop. Findings of Fact [Dkt. No. 114] ¶ 33. The court finds that the hair "extension" in the commercial is greatly exaggerated. Gillette does contend, however, that the M3 Power's oscillations cause beard hairs to be raised out of the skin. Gillette contends that the animated product demonstration showing hair extension in its revised commercials is predicated on its testing showing that oscillations cause "trapped" facial hairs to lengthen from the follicle so that more of these hairs' length is exposed. Gillette propounds two alternative physiological bases for its "hair extension" theory. First, Gillette hypothesizes that a facial hair becomes "bound" within the follicle due to an accumulation of sebum and corneocytes (dead skin cells). Gillette contends that the oscillations could free such a "bound" hair. Second, Gillette hypothesizes that hairs may deviate from their normal paths in the follicle and become "trapped" outside the path until vibrations from the M3 Power restore them to their proper path.

Schick's expert witness, Dr. David Leffell, Professor of Dermatology and Chief of Dermatologic Surgery at the Yale School of Medicine, testified that, based on his clinical and dermatological expertise, he is aware of no scientific basis for the claim that the oscillations of the M3 Power would result in hair extension, as Gillette contends. Dr. Leffell stated that Gillette's "hair extension" theory is inconsistent with his 20 years of experience in dermatology. He testified that he has never seen a hair trapped in a sub-clinical manner, as hypothesized by Gillette. Dr. Leffell testified that, in certain circumstances, trapped hairs will result in clinical symptoms, such as infection or

8

inflammation. With respect to Gillette's hypothesis that the interaction between sebum and corneocytes trap hairs, however, Dr. Leffell stated, and the court credits, that in non-clinical circumstances, sebum and corneocytes do not accumulate sufficiently to inhibit hair growth. Moreover, everyday activities such as washing or shaving remove accumulations of sebum and corneocytes.

Gillette's expert hair biologist, Dr. Michael Philpott, has studied hair biology for almost twenty years. He testified that, prior to his retention as an expert by Gillette, he had never seen a hair trapped in the manner posited by Gillette. Only after being retained by Gillette did Dr. Philpott first claim to have encountered this hair extension theory. Dr. Philpott acknowledged that neither of Gillette's two hypothesis of hair extension have any support in medical or scientific literature. With regard to Gillette's theory that hair could become bound in the follicle by sebum and corneocytes, Dr. Philpott admitted that no evidence supports that theory. Dr. Leffell testified that erector pili muscles, which cause hairs to stand up in response to various stimuli, as is commonly seen in the case of goosebumps, may also provide a biologicial mechanism for hair extension. Neither Dr. Leffell nor Dr. Philpott, however, testified on the relationship between the application of mechanical energy and the erector pili muscles, and neither party has contended that these muscles play a role in Gillette's hair extension theory.

In addition to positing biological mechanisms that might support the claim that the M3 Power's oscillations raise hairs, Gillette introduced evidence of experiments and testing to support those claims. Gillette provided summaries of said testing which were not prepared contemporaneously with the testing, conducted in the early 1990's, they

9

purport to memorialize. Instead, they were prepared in anticipation of litigation in late 2004.

Gillette performed experiments using oscillating razors in 1990, 1991 and 2003. In 1990 and 1991, Gillette performed studies using prototype oscillating razor handles fitted with razor systems other than the M3 Power, the Atra Plus and Sensor razor cartridge, two other Gillette products. In each of these initial experiments, a circle was drawn on a test subject's face. Twenty beard hairs within the circled region were measured with an imaging stereomicroscope manufactured by the Leica Company. That instrument measures hairs three-dimensionally to a resolution of three to four microns. The test subject then stroked the area using an oscillating razor with blunted blades. Then, twenty beard hairs within the circled region were again measured with a stereomicroscope. The same protocol was followed using a non-oscillating razor with blunted blades, and the changes in hair measurement were compared.

The Atra Plus study was performed in 1990 and included 10 test subjects. The study results show that the panelists' average hair length increased by 83.3 microns after five strokes with the oscillating razor versus 6.3 microns with the non-oscillating razor. The Sensor study was performed from 1990 to 1991 and also involved 10 test subjects. The subjects' mean hair length increased by 27.9 microns versus 12.9 microns with the non-oscillating razor. While both tests provided some evidence of a hair extension effect and the magnitude of that effect, neither test indicated what percentage of hairs were lengthened.

Notably, while Gillette found that use of both the oscillating Atra Plus and Sensor razors resulted in an increase in beard hair length, there was significant difference

10

between the average increase caused by the Atra Plus and that caused by the Sensor.
Furthermore, no evidence was presented to the court regarding similarities or
differences between the M3 Power razor and the Atra Plus or Sensor. The sample
size, ten test subjects per study, was small. The twenty beard hairs measured prior to
stroking were not necessarily the same hairs measured after stroking. The test
included no efforts to keep constant the variables of pressure on the razor or speed of
the shaving stroke. In addition, Gillette's chief scientist, Kevin Powell, testified that the
pressure or load applied by consumers co-varies to a statistically significant degree with
whether a razor oscillates. All these deficiencies cause this court not to credit the
studies' finding that oscillations cause hair lengthening.[3]

In 2003, Gillette performed a study using a prototype of the M3 Power. In the fall
of 2003, Gillette tested a Mach 3 cartridge fitted with an oscillating handle. That
prototype was called the "Swan." The Swan prototype's motor, handle, and cartridge
differ from those features of the actually-marketed M3 Power. Four test subjects were
used.[4] The test protocol was identical to that used in 1990 and 1991 except that,
instead of using blunted blades, Gillette removed the blades from the razor. The study
results suggest that the oscillating-Swan-prototype produced an average increase in
hair length of between 32 and 40 microns while the non-oscillating prototype yielded no

---

[3]In Gillette's testing, no effort was made to control for variables, such as pressure on, or
speed of, the razor. Failure to control for variable makes Gillette's "results" unscientific and not
supportive of any conclusion.

[4]The sample size of four was chosen because the 2003 study, according to Gillette, was
merely "confirmatory." Because the court finds the earlier tests deficient, the 2003 study cannot
be "confirmatory."

11

average increase. That 32 to 40 micron increase represented an average of eight to
ten percent increase in hair length. The test does not indicate what percentage of hairs
experience any lengthening as a result of oscillations. The court does not credit Dr.
Powell's opinion that the differences between the model used in the test and the
marketed product has no impact on the testing. Failure to use the marketed product is
critical. The court cites the varied results Gillette reports between the Atra Plus,
Sensor, and "Swan" tests as only one reason to conclude that failure to use the market
product undercuts the 2003 testing. Further, the test protocol and sample size cause
the court to question the validity of these study findings.

In addition to testing oscillating battery-powered razors, Gillette conducted what
has been called the Microwatcher study. The Microwatcher is a commercially available
product consisting of a miniature camera with an illumination system that channels light
into an orifice at the tip of a transparent hemispherical dome. The device allows the
user to impart mechanical energy into the top and underlying layers of the skin, which,
according to Gillette, replicates the mechanical energy imparted by the oscillating
razor.[5] The recorded video images introduced into evidence show individual hairs
releasing from just below the skin surface. Gillette did not introduce evidence to
describe what the various elements of the photo were. When asked by the court to
identify the various elements appearing in the video were, Dr. Philpott could not identify

---

[5]Despite conducting the study on eighteen subjects, Gillette submitted only three short
video clips and does not indicate that they are representative of the study results. Further,
there is no indication of the length of the manipulation, the amount of pressure applied, or
shave preparation. Without more information, the study cannot support the conclusion that the
M3 Power extends hair.

12

or explain important skin features. For example, the court pointed to an area

surrounding the individual hair, of darker hue than the rest of the skin, on the video, but

Dr. Philpott could not explain what that area was or what might explain its coloration.

The court further finds that Gillette provides no evidence to suggest the relationship

between the amount of mechanical energy imparted by the Microwatcher and that

imparted by the M3 Power.

Schick performed its own study which it contends proves the falsity of Gillette's

advertising with respect to claims regarding hair extension.[6]  Schick's study took place

over three days and included 37 test subjects.  With respect to each test subject, twenty

hairs were measured before and after strokes with an M3 Power razor with blunted

blades in both the power-on and power-off modes.  The strokes were taken using an

automated shaving device developed specially by Schick for the purposes of testing the

M3 Power razor and Gillette's claims with respect to it.  Images of the hairs were taken

before and after the razor strokes using a camera with a plate that flattened hair onto

the face.  The images were then downloaded to a computer and hair lengths were

assessed using ImagePro software.  An independent statistician evaluated the data for

all three days.  Schick argues that its data indicates that there was no statistically

significant difference between the change in hair length with power off and the change

in hair length with power on.

Again, however, the court finds the test protocol lacking and results

questionable.  Schick's testing shows that some hairs shrunk even in the absence of

---

[6]Schick first performed tests to determine whether the M3 Power changes the angle of
beard hairs.

the use of water, which Gillette's testing has found to result in hair shrinkage. Schick's

expert testified that this may have been the result of measurement error, and the court

agrees.[7]  Furthermore, Gillette provided expert testimony that the glass plate used to

flatten hairs so that they could be measured would likely result in distortion, making it

difficult to accurately measure hair lengths.  Such flaws in Schick's testing cause the

court to be skeptical of Schick's test results and the suggestion that these results

demonstrate that the M3 Power does not cause hairs to extend.

The flaws in testing conducted by both parties prevent the court from concluding

whether, as a matter of fact, the M3 Power raises beard hairs.

## II.    ANALYSIS

### A.    Irreparable Harm

Schick argues that the M3 Power advertising is causing it irreparable harm.

Sales of its premiere razor, the Quattro, have decreased precipitously since Gillette's

release of the M3 Power.  It is far from clear that all of the decline in Quattro sales is

attributable to the allegedly false statements made in the course of M3 Power

advertising.  It is this difficulty, however, in determining what portion of the decline is so

attributable that makes Schick's harm irreparable.  "It is virtually impossible to prove

that so much of one's sales will be lost or that one's goodwill will be damaged as a

direct result of a competitor's advertisement. Too many market variables enter into the

advertising-sales equation. Because of these impediments, a Lanham Act plaintiff who

can prove actual lost sales may obtain an injunction even if most of his sales decline is

_____

[7] It may also result from the application of a glass plate meant to flatten the hairs so that
they could be measured in two dimensions.

14

attributable to factors other than a competitor's false advertising." Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 316 (2d Cir. 1982).

Gillette argues that Schick's delay in seeking relief, as a factual matter, militates against a finding of irreparable harm. "Delay is typically relevant to both irreparable harm and to laches, although the latter doctrine relates only to permanent relief." Tom Doherty, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 39 (2d Cir. 1995) (considering delay in seeking preliminary injunction in the context of a contract dispute). Depending on the facts of a particular case, delay may be relevant for other purposes as well. Id. In a trademark case, where a "high probability of confusion" normally gives rise to a presumption of irreparable harm for the purposes of obtaining a preliminary injunction, that presumption is "inoperative if the plaintiff has delayed either bringing suit or in moving for preliminary injunctive relief." Tough Traveler, Ltd. v. Outbound Products, 60 F.3d 964, 967-68 (2d Cir. 1995). It is important to remember, however, that a finding of irreparable harm may still be made on the basis of other relevant factors; the inexcusable delay affects only the presumption of irreparable harm. Id. at 969. In the instant context, the court considers delay as one of several factors to be considered in determining whether Schick has established irreparable harm.

There is no presumption of irreparable harm in this case as such a presumption arises in the false advertising context only when the challenged advertising mentions a competitor by name. Castrol, Inc. v. Quaker State Corp., 977 F.2d 57, 62 (2d Cir. 1992). Furthermore, in the instant case, the reasons for Schick's delay ought to guide the court's consideration of whether that delay is probative with respect to the question of irreparable harm. In the trademark context, a delay is excused where "the plaintiff

15

does not know how severe the [trademark] infringement is" or where it is caused by a plaintiff's "good faith efforts to investigate an infringement." Id. A delay is inexcusable where a party was aware of the action it now wishes to enjoin, but the delay evidences that the party determined that the action did not violate its rights. Tom Doherty, Inc., 60 F.3d at 39.

Schick provides two excuses for the time lag between the initial airing of the allegedly-false Gillette advertising. The first is that it needed time to subject the claims made in the contested advertising to scientific testing. While the advertising began to air publicly in late May 2004, Schick did not complete its testing until October 2004. While the testing could have proceeded more quickly, see supra at 5, there are reasons the testing took five months and that period, to the extent that it is deemed "delay," is excused. Schick was engaged in a good faith investigation of its competitor's claims.

The second excuse for delay involves the three month period after Schick's initial testing had been completed. Schick claims that the expense of pursuing litigation in a United States forum led it to test Gillette's claims in other fora in November 2004, before initiating the instant lawsuit. Therefore, upon completing its testing, it initiated lawsuits abroad, prior to initiating the instant suit in late January 2005. Schick argues that its attempts to resolve the issue in alternative fora excuse its delay. The cases it cites, however, either address delay in the context of patent litigation, Whistler Corp. v. Dynascan Corp., 1988 WL 142216, *2 (N.D.Ill. Dec. 28, 1988) (excusing period of delay where plaintiff in patent infringement suit first "adjudicated another lawsuit that would establish a reasonable likelihood of success on the issue of infringement in the pending case"); Amicus, Inc. v. Post-Tension of Texas, Inc., 686 F.Supp. 583, 589 (S.D. Tex.

16

1987) (same), or address arbitration or settlement attempts, not forum-shopping in foreign jurisdictions, see Millennium Imp. Co. v. Sidney Frank Importing Co., 2004 USDistLexis 11871, *33-*34 (Jun. 11, 2004) (refusing to find that delay barred preliminary injunction of false advertising where parties had pursued alternative dispute resolution before the National Advertising Division of the Council of Better Business Bureaus prior to plaintiff filing suit); Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 129 F.Supp.2d 351 (D.N.J. 2000) (finding of irreparable harm in false advertising context not undermined by seven month-delay where plaintiff "notified J & J of its objections, promptly challenged the advertisements with the major networks, obtained the results of [a consumer survey]," and shortly thereafter initiated litigation); Tonka Corp. v. Rose Art Industries, Inc., 836 F.Supp. 200, 219 (D.N.J. 1983) (alleged delay did not support an acquiescence defense where plaintiff had filed an objection to defendant's trademark registration). The process of alternative dispute resolution of a false advertising claim is distinguishable from bringing litigation in a foreign jurisdiction.  The parties could not have resolved, in Germany or Australia, a dispute regarding advertising within the United States.  The cases that allow pursuit of remedies (through alternative dispute mechanisms) to constitute excusable delay do so because such mechanisms may have, with less expense and consumption of time, achieved a remedy substantially similar to that sought in court, an injunction.  The same is not true of Schick's legal actions in foreign jurisdictions, which, even if successful, had no effect on Schick's legal rights in the United States.

Schick argues that the case law on delay is motivated by the need to notice

17

parties that a claim for false advertising may lie against them. This purpose, according to Schick, was served by the German litigation as well as non-judicial interactions between the parties prior to initiation of any litigation. However, Schick misunderstands the import of inexcusable delay in the context of an application for a preliminary injunction. As a factual matter, such delay suggests that irreparable harm does not exist as the moving party, for some significant period of time, declined to exercise rights that may have mitigated the irreparable harm it was suffering. The litigation in Germany and Australia had no legal effect on advertising in the United States and, for the purposes of the instant lawsuit, it is advertising in the United States that, according to Schick, is causing it to suffer irreparable harm.

The court concludes that the three months during which Schick pursued foreign litigation is not inexcusable. See Tom Doherty, Inc., 60 F.3d at 39. Clearly Schick did not think Gillette's advertisements were not violating Schick's rights.

The court, therefore, considers Schick's delay in seeking relief alongside other evidence going to the factual question of irreparable injury. The court concludes that Schick's initiation of testing in May 2004 suggests that Schick believed it was being harmed from the day the M3 Power was launched. The severe decline in Quattro sales supports a finding of harm as does the fact that the parties are head-to-head competitors. Furthermore, the difficulty of determining what percentage of sales is attributable to Gillette's allegedly false advertising, and, therefore, the difficulty of accurately determining what monetary damages will compensate Schick for its harm, support a finding that any such harm is, indeed, irreparable.

**B.    False Advertising**

18

**1. Literal Falsity.** "Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertising is literally true, it is likely to deceive or confuse customers." Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997). "A plaintiff's burden in proving literal falsity thus varies depending on the nature of the challenged advertisement." Castrol, Inc., 977 F.2d at 63. The Second Circuit has found that where an advertisement alleges that tests have established a product's superiority, a plaintiff must demonstrate that the tests or studies did not prove such superiority. "[A] plaintiff can meet this burden by demonstrating that the tests were not sufficiently reliable to permit a conclusion that the product is superior." Id. In addition, "[i]f the plaintiff can show that the tests, even if reliable, do not establish the proposition asserted by the defendant, the plaintiff has obviously met its burden." Id.

Where, however, as here, the accused advertising does not allege that tests or clinical studies have proven a particular fact, the plaintiff's burden to come forward with affirmative evidence of falsity is qualitatively different. "To prove that an advertising claim is literally false, a plaintiff must do more than show that the tests supporting the challenged claim are unpersuasive." Mc-Neil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir. 1991). The plaintiff must prove falsity by a preponderance of the evidence, either using its own scientific testing or that of the defendant. If a plaintiff is to prevail by relying on the defendant's own studies, it cannot do so simply by criticizing the defendant's studies. It must prove either that "such tests 'are not sufficiently reliable to permit one to conclude with reasonable certainty that they established' the claim made" or that the defendant's studies establish that the

19

defendant's claims are false. Id. at 1549-50.

The challenged advertising consists of two basic components: an animated representation of the effect of the M3 Power razor on hair and skin and a voice-over that describes that effect. The animation, which lasts approximately 1.8 seconds, shows many hairs growing at a significant rate, many by as much as four times the original length. During the animation, the voice-over states the following: "Turn it on and micropulses raise the hair so the blades can shave closer." Schick asserts that this M3 Power advertising is false in three ways: first, it asserts the razor changes the angle of beard hairs; second, it portrays a false amount of extension; and third, it asserts that the razor raises or extends the beard hair.

With regard to the first claim of falsity, if the voiceover means that the razor changes the angle of hairs on the face, the claim is false. Although Gillette removed the "angle changing" claim from its television advertisements, it is unclear whether it has completely removed all material asserting this angle-change claim. The court concludes that the current advertising claim of "raising" hair does not unambiguously mean to changes angles.[8] See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 298 F.3d 578, 587 (3d Cir. 2002) ("only an unambiguous message can be literally false"). Thus, the revised advertising is not literally false on this basis.

With regard to the second asserted basis of falsity, the animation, Gillette concedes that the animation exaggerates the effect that the razor's vibration has on

---

[8]It is the words "up and away" when combined with "raises" that suggest both extension and angle change.

20

hair. Its own tests show hairs extending approximately 10% on average, when the animation shows a significantly greater extension. The animation is not even a "reasonable approximation," which Gillette claims is the legal standard for non-falsity. See Gillette's Prop. Conclusions of Law at ¶ 32, 37-38 [Dkt. No. 114]. Here, Schick can point to Gillette's own studies to prove that the animation is false. See Mc-Neil-P.C.C., Inc. , 938 F.2d at 1549.

Gillette argues that such exaggeration does not constitute falsity. However, case law in this circuit indicates that a defendant cannot argue that a television advertisement is "approximately" correct or, alternatively, simply a representation in order to excuse a television ad or segment thereof that is literally false. S.C. Johnson & Son, Inc., 241 F.3d at 239-40 (finding that depiction of leaking plastic bag was false where rate at which bag leaked in advertisement was faster than rate tests indicated); Coca-Cola Co., 690 F.2d at 318 (finding that advertisement that displaced fresh-squeezed orange juice being poured into a Tropicana carton was false). Indeed, "[the Court of Appeals has] explicitly looked to the visual images in a commercial to assess whether it is literally false." S.C. Johnson, 241 F.3d at 238.[9]

Gillette's argument that the animated portion of its advertisement need not be exact is wrong as a matter of law. Clearly, a cartoon will not exactly depict a real-life situation, here, e.g., the actual uneven surface of a hair or the details of a hair plug. However, a party may not distort an inherent quality of its product in either graphics or

---

[9] At least one other circuit has held that picture depictions can constitute false advertising. Scotts Co. v. United Indus. Corp., 315 F.3d 264 (4th Cir. 2002) (finding that while ambiguous graphic on packaging did not constitute literally false advertising, an unambiguous graphic could do so).

21

animation. Gillette acknowledges that the magnitude of beard hair extension in the animation is false. The court finds, therefore, that any claims with respect to changes in angle and the animated portion of Gillette's current advertisement are literally false.

The court does not make such a finding with respect to Schick's third falsity ground, Gillette's hair extension theory generally. Gillette claims that the razor's vibrations raise some hairs trapped under the skin to come out of the skin. While its own studies are insufficient to establish the truth of this claim, the burden is on Schick to prove falsity. Neither Schick's nor Gillette's testing can support a finding of falsity.

While there can be no finding of literal falsity with respect to Gillette's hair extension claim at this stage in the instant litigation, the court expresses doubt about that claim. As described earlier, Gillette's own testing is suspect. Furthermore, Schick introduced expert testimony and elicited evidence from Gillette's expert regarding the lack of scientific foundation for any biological mechanism that would explain the effect described by Gillette in its advertising. Gillette's own expert, Dr. Philpott, testified that no scientific foundation exists to support Gillette's hypothesis that beard hairs might be trapped under the skin by sebum and corneocytes and that the application of mechanical energy might release such hairs. While Dr. Philpott put forward another hypothesis--that a hair's curliness might cause it to be trapped--he also conceded that, prior to his engagement as an expert on Gillette's behalf, in twenty years of studying hair, he had never come across such a phenomenon. The court credits the testimony of Schick's expert, Dr. Leffell, that while certain clinical conditions are characterized by hairs trapped under the surface of the skin, there is no such non-clinical phenomenon.

Nevertheless, putting forth credible evidence that there is no known biological

22

mechanism to support Gillette's contention that the M3Power raises hairs is insufficient
to meet Schick's burden. Such evidence is not affirmative evidence of falsity. Further,
while Schick successfully attacked Gillette's testing, that attack did not result in
evidence of falsity. Unlike in McNeil, here Gillette's own tests do not prove hair
extension does not occur. Schick merely proved that Gillette's testing is inadequate to
prove it does occur.

**2. Actual Deception.** Schick need not prove actual deception if Gilette's
advertising is determined to be literally false. Mc-Neil-P.C.C., Inc., 938 F.2d at 1549
("Where the advertising claim is shown to be literally false, the court may enjoin the use
of the claim without reference to the advertisement's impact on the buying public."
(internal quotation marks and citations omitted)). Because the court finds that claims
regarding angle change and the magnitude and frequency of hair extension portrayed in
the animated portion of Gillette's television advertisement are both literally false, it
presumes that these claims result in actual deception.

**3. Materiality.** "It is also well-settled that, in addition to proving falsity,
the plaintiff must also show that the defendants misrepresented an inherent quality or
characteristic of the product. This requirement is essentially one of materiality, a term
explicitly used in other circuits." S.C. Johnson & Son, Inc., 241 F.3d at 238 (internal
quotation marks and citations omitted). In determining that certain allegedly false
statements were not material, the Second Circuit considered the relevance of the
statements and the fact that "[t]he inaccuracy in the statements would not influence
customers." Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997).

It is clear that whether the M3 Power raises hairs is material. Gillette's employees testified that television advertising time is too valuable to include things that are "unimportant". Furthermore, in this case, hair extension is the "reason to believe" that the M3 Power is a worthwhile product. The magnitude and frequency of that effect are also, therefore, material. Whether a material element of a product's performance happens very often and how often that element happens are, in themselves, material.

**4. Injury.** The court finds that, in light of the advertisement's literal falsity, the fact that the parties are head-to-head competitors, and recent declines in the sale of Schick's premiere wet shave system injury will be presumed. Coca-Cola Co., 690 F.2d at 316-317. While Schick has not submitted consumer surveys or market research, the fact that the parties are head-to-head competitors supports an inference of causation.

**5. Interstate Commerce.** The parties do not dispute that this element of the claim has been established.

Accordingly, the court finds that Schick has established a likelihood of success on the merits of its claims insofar as Gillette's claims regarding changes in hair angle and its animation depicting an exaggerated amount of hair extension are literally false. The court finds that Schick has failed to establish a likelihood of success, or even serious questions going to the merits, on the claim of hair "extension."

## BOND

Gillette has requested a bond of $49,579,248. It contends that this amount represents estimated lost profits on future M3 Power sales, over a twelve-month period, if later found to have been wrongfully enjoined. Schick submits that a bond of $50,000

24

to \$100,000 is appropriate.

Gillette's calculations assume a precipitous drop in sales as a result of a mandate to correct two admitted falsities in its advertisement.[10] The court is skeptical that this calculation represents an appropriate bond amount.[11] Instead, the court imposes a bond of \$200,000 on Schick. Absent a record created by Gillette, the court concludes this amount, generally in the range for false advertising cases, is sufficient to protect Gillette. Gillette may move to increase the bond amount upon a showing of likely injury.

## CONCLUSION

For the reasons stated above the Motion for Preliminary Injunction [Dkt. No. 7] is GRANTED in part and DENIED in part. The injunction is entered as stated in the accompanying order. Schick's Motion for Leave to Amend [Dkt. No. 103] is GRANTED.

## SO ORDERED

Dated at Bridgeport, Connecticut this 31st day of May, 2005.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge


[10]While Gillette contends that the animated portion of its advertisement is not literally false as a matter of law, it has conceded that, as a factual matter, the animation represents an exaggerated hair-extension effect.

[11]Does it claim that it cannot sell one M3 Power razor without making false claims regarding angle change or the magnitude of hair extension? When it ceased television and print advertising with the "angle change," did its sales drop precipitously?

25

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Kevin Windom, a Wisconsin resident, on behalf of himself, the general public, and all others similarly situated

### DEFENDANTS
The Gillette Company, a Delaware Corporation

**(b)** County of Residence of First Listed Plaintiff    Milwaukee, WI
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    New Castle, DE
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Thomas M. Sobol, Hagens Berman Sobol Shapiro, LLP
One Main Street, Cambridge MA, 02142  Phone:(617) 482-3700

Attorneys (If Known)

05 C 11207 RWZ

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☒ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity)**:

Brief description of cause:
Claim for Unjust Enrichment against Gillette for unlawful and deceptive advertising.

## VII. REQUESTED IN COMPLAINT:
☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☑ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE                DOCKET NUMBER

DATE
06/08/2005

SIGNATURE OF ATTORNEY OF RECORD
Thomas M. Sobol

### FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) _____ Kevin Windom, et al. v. The Gillette Company _____

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

| | I. | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT. |
|---|---|---|
| [ ] | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121<br>740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.   for patent, trademark or copyright cases |
| [✓] | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,<br>315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,<br>380, 385, 450, 891. |
| [ ] | IV. | 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,<br>690, 810, 861-865, 870, 871, 875, 900. |
| [ ] | V. | 150, 152, 153. |

05 ~ 11207 RWZ

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

      YES [ ]    NO [✓]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

      YES [ ]    NO [✓]

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

      YES [ ]    NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

      YES [ ]    NO [ ]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

      YES [ ]    NO [✓]

    A.    If yes, in which division do all of the non-governmental parties reside?

        Eastern Division [ ]    Central Division [ ]    Western Division [ ]

    B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division [✓]    Central Division [ ]    Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

      YES [ ]    NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _____ Thomas M. Sobol _____

ADDRESS _____ Hagens Berman Sobol Shapiro, One Main Street, Cambridge MA 02142 _____

TELEPHONE NO. _____ (617) 482-3700 _____

(CategoryForm.wpd  - 5/2/05)